# EXHIBIT A

1   MICHAEL L. MALLOW (State Bar No. 188745)
    mmallow@loeb.com
2   LAURA A. WYTSMA (State Bar No. 189527)
    lwytsma@loeb.com
3   CHRISTINE M. REILLY (State Bar No. 226388)
    creilly@loeb.com
4   LOEB & LOEB LLP
    10100 Santa Monica Boulevard, Suite 2200
5   Los Angeles, California 90067-4120
    Telephone:  (310) 282-2000
6   Facsimile:  (310) 282-2200

7   Attorneys for Defendant
    Campbell-Ewald Company

8

9                   UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11

12   JOSE GOMEZ, individually and on          Case No. CV10-2007-DMG (CWx)
     behalf of a class of similarly situated
13   individuals,                             Assigned to Hon. Dolly M. Gee

14            Plaintiff,                       **MEMORANDUM OF POINTS AND
                                               AUTHORITIES IN SUPPORT OF
15        v.                                   DEFENDANT CAMPBELL-EWALD
                                               COMPANY'S MOTION FOR
16                                             SUMMARY JUDGMENT**

17   CAMPBELL-EWALD COMPANY, a               [Filed concurrently with Notice
18   Delaware corporation,                    of Motion and Motion for Summary
                                              Judgment; Statement of Uncontroverted
19            Defendant.                      Facts; Declarations of Daniel Rioux,
                                              Lee Buchschacher, and Christine M.
20                                            Reilly; Request for Judicial Notice;
                                              and [Proposed] Judgment]
21

22                                            Date:  December 9, 2011
                                              Time:  3:00 p.m.
23                                            Ctrm:  7  (Spring Street)

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

FACTUAL BACKGROUND ......................................................................... 1

    A.    C-E Contracts With the U.S. Navy to Achieve Recruitment Goals ............................................................................................... 1

    B.    NRC Approves the Recruiting Plan for the Year ................................. 3

    C.    NRC Approves Mobile Campaigns for its Recruiting Audience ........................................................................................... 3

    D.    MindMatics Proposes a Mobile Campaign for the Navy .................... 4

    E.    The Navy Approves MindMatics' Mobile Campaign ......................... 5

    F.    MindMatics Implements the Navy's Mobile Campaign ...................... 6

LEGAL ARGUMENT ................................................................................... 7

I.    Summary Judgment Is Appropriate When, as Here, the Undisputed Facts Compel Dismissal as a Matter of Law ............................... 7

II.    The Doctrine of Derivative Sovereign Immunity Bars This Suit ................... 8

    A.    The Navy Enjoys Absolute Immunity from TCPA Liability ............... 8

    B.    As the Navy's Agent, C-E Enjoys Derivative Sovereign Immunity ........................................................................................ 9

III.    C-E Cannot Be Held Liable Because It Did Not "Make" or "Initiate" the Text Message Sent to Gomez .................................................. 10

IV.    C-E Cannot Be Held Liable Because The Text Message Was Sent "on Behalf of" the United States Navy ............................................... 13

V.    C-E Cannot be Held Liable Under Common Law Agency Principles Because It Acted as an Agent for the U.S. Navy ......................... 14

VI.    The TCPA's Cell Phone Provision is Unconstitutional As Applied to the Noncommercial Speech in This Case .................................... 17

CONCLUSION ............................................................................................. 22

# TABLE OF AUTHORITIES

**CASES**
<u>Page</u>

*Abbas v. Selling Source, LLC*,
    No. 09 CV 3413, 2009 WL 4884471 (N.D. Ill. Dec. 14, 2009)..........................18

*Accounting Outsourcing, LLC. v. Verizon Wireless Personal*
    *Comm's*, L.P., 329 F. Supp. 2d 789 (M.D. La. 2004) .............................9, 18, 20

*Am. Title Ins. Co. v. Lacelaw Corp.*,
    861 F.2d 224 (9th Cir. 1988).....................................................................12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................................7

*Applestein v. Fairfield Resorts*,
    No. 0004, 2009 WL 5604429 (Md. Ct. App. July 8, 2009) .........................12

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
    352 F. Supp. 2d 1119 (C.D. Cal. 2005)......................................................8

*Arango v. Guzman Travel Advisors Corp.*,
    621 F.2d 1371 (5th Cir. 1980).................................................................10

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001) ................................................................................20

*Block v. North Dakota*,
    461 U.S. 273 (1983) ..................................................................................8

*Board of Regents of Univ. of Wis. System v. Southworth*,
    529 U.S. 217 (2000) ................................................................................18

*Board of Trustees of State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989) ................................................................................19

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ................................................................................10

*Butters v. Vance Int'l., Inc.*,
    225 F.3d 462 (4th Cir. 2000)....................................................................9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................................7

*City Council v. Taxpayers for Vincent,*
    466 U.S. 789 (1984)................................................................21

*FDIC v. Meyer,*
    510 U.S. 471 (1994)..................................................................8

*Hall v. United States,*
    314 F. Supp. 1135 (N.D. Cal. 1970) ........................................12

*Heine v. Raus,*
    399 F.2d 785 (4th Cir. 1968)...................................................17

*INS. v. Cardozo-Fonseca,*
    480 U.S. 421 (1987)................................................................13

*Int'l Science & Tech. Inst., Inc. v. Inacom Commc'ns, Inc.,*
    106 F.3d 1146 (4th Cir. 1997)..................................................13

*Jerome v. United States,*
    318 U.S. 101 (1943)................................................................15

*Koohi v. United States,*
    976 F.2d 1328 (9th Cir. 1992)...................................................8

*Lane v. Pena,*
    518 U.S. 187 (1996)..................................................................8

*Lozano v. Twentieth Century Fox Film Corp.,*
    702 F. Supp. 2d 999 (N.D. Ill. 2010) ......................................18

*Mac's Shell Serv. v. Shell Oil Prods. Co. LLC,*
    130 S. Ct. 1251 (2010) ............................................................14

*Mangold v. Analytic Servs., Inc.,*
    77 F.3d 1442 (4th Cir. 1996)......................................................9

*Marshall v. Gravitt,*
    No. 206-CV-0536-RCJ-GWF, 2007 WL 1792416 (D. Nev. June 18, 2007).....15

*Missouri ex rel. Nixon v. American Blast Fax, Inc.,*
    323 F.3d 649 (8th Cir. 2003)....................................................17

*Newman v. Checkrite California,*
    912 F. Supp. 1354 (E.D. Cal. 1995) .........................................17

iii

*Opp v. Wheaton Van Lines, Inc.,*
   231 F.3d 1060 (7th Cir. 2000)................................................................17

*Pleasant Grove City, Utah v. Summum,*
   555 U.S. 460 (2009)..........................................................................18

*Retuta v. Holder,*
   591 F.3d 1181 (9th Cir. 2010).............................................................11

*Reynolds v. Diamond Foods & Poultry, Inc.,*
   No. ED 79488, 2002 WL 171438 (Mo. App. Feb. 5, 2002) ......................9

*Romine v. Diversified Collection Servs. Inc.,*
   155 F.3d 1142 (9th Cir. 1998).......................................................11, 14

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
   515 U.S. 819 (1995)..........................................................................18

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
   547 U.S. 47 (2006)............................................................................18

*Rust v. Sullivan,*
   500 U.S. 173 (1991)..........................................................................18

*Satterfield v. Simon & Schuster, Inc.,*
   569 F.3d 946 (9th Cir. 2009)........................................................11, 20

*Sorrell v. IMS Health Inc.,*
   131 S.Ct. 2653 (2011) (Breyer, J., dissenting) .....................................19

*Taylor v. List,*
   880 F.2d 1040 (9th Cir. 1989)..............................................................7

*United States v. Dish Network, LLC,*
   667 F. Supp. 2d 952 (C.D. Ill. 2009)................................................13, 14

*United States v. Herrera,*
   29 F. Supp. 2d 756 (N.D. Tex. 1998)...................................................11

*United States v. King,*
   395 U.S. 1 (1969)................................................................................8

*US Fax Law Center, Inc. v. iHire, Inc.,*
   362 F. Supp. 2d 1248 (D. Colo. 2005)..................................................15

*Virginia v. Hicks,*
    539 U.S. 113 (2003) ...................................................................................21

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ...................................................................................19

*Weber v. U.S. Sterling Secs., Inc.,*
    282 Conn. 722 (2007) ................................................................................15

*Welch v. Bancorp Mgmt. Advisors, Inc.,*
    296 Ore. 208 (1983) ..................................................................................17

*White v. Witt,*
    No. C05-0695JLR, 2006 WL 2372296 (W.D. Wash. Aug. 15, 2006)................8

*Yearsley v. W.A. Ross Constr. Co.,*
    309 U.S. 18 (1940) ....................................................................................10

**CONSTITUTION AND STATUTES**

1 U.S.C. § 1 ........................................................................................................9

47 U.S.C. § 153(39) ...........................................................................................9

47 U.S.C. § 227(b)(1) .........................................................................................9

47 U.S.C. § 227(b)(1)(A)(iii) ..........................................................10, 14, 19, 21

47 U.S.C. § 227(b)(1)(A)(iii) ............................................................................13

47 U.S.C. § 227(b)(3) .......................................................................................13

47 U.S.C. § 227(c)(5) ........................................................................................13

U.S. Const. amend. I ...........................................................................1, 2, 18, 19

U.S. Const., Art. 1, § 8 ......................................................................................20

**RULES AND REGULATIONS**

7 F.C.C.R. 8752, 1992 WL 690928 (F.C.C. Oct. 19, 1992).....................................19

10 F.C.C.R. 12391, 1995 WL 464817 (F.C.C. Aug. 7, 1995) ................................13

47 C.F.R. § 64.1200(a)(1)(iii) ............................................................................11

47 C.F.R. § 64.1200(a)(2)(v).............................................................................13

47 C.F.R. § 64.1200(c)(2) .................................................................................13

MEMORANDUM OF POINTS & AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-10-2007-DMG (CWx)

47 C.F.R. § 64.1200(c)(2) ..................................................................13

47 C.F.R. § 64.1200(d)........................................................................13

47 C.F.R. § 64.1200(f)(5) ....................................................................11

47 C.F.R. § 1200(a)(1)(iii) ...................................................................13

47 C.F.R. § 1200(c)(2) .........................................................................13

47 C.F.R. § 1200(d)..............................................................................13

Fed. R. Civ. P. 1 ....................................................................................7

Fed. R. Civ. P. 56(c)..............................................................................7

Fed. R. Civ. P. 56(e)..............................................................................7

**OTHER AUTHORITIES**

Black's Law Dictionary at 784 (6th ed. 1990) ....................................11

Restatement (Second) of Agency § 343 (1958) ..................................15

Restatement (Second) of Torts § 10(1) (1965)....................................15

Restatement (Second) of Torts § 10 (1965) ........................................16

Restatement (Second) of Torts § 10 (1965), cmt. d. .....................16, 17

Restatement (Second) of Torts § 10(2)(b) (1965) ..............................17

Restatement (Second) of Torts § 10(2)(b), (c) (1965)........................16

Restatement (Third) Of Agency § 7.01 (2006), cmt. c.......................12

Restatement (Third) Of Agency § 7.01 (2006), cmt. e...............14, 15, 16

Webster's Third New International Dictionary 318 (2002) ..................11

MEMORANDUM OF POINTS & AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-10-2007-DMG (CWx)

## INTRODUCTION

Plaintiff Jose Gomez ("Gomez") filed suit against Campbell-Ewald Company ("C-E") because in May 2006 he received a single text message from the United States Navy asking him to serve a "greater cause" for his country. His complaint concedes that the text message was sent on behalf of the U.S. Navy by a third-party. Yet Gomez seeks hundreds of millions of dollars from C-E, the Navy's advertising agent, in this putative class action under the Telephone Consumer Protection Act ("TCPA") for a text message that C-E did not send and that was not sent on its behalf. The law and indisputable facts establish that C-E cannot be held liable for the TCPA violations alleged in Gomez's complaint.

Liability cannot lie against C-E as a matter of law for several reasons. First, the U.S. Navy is immune from liability under the TCPA and, as Gomez himself alleged, C-E acted "on behalf of the U.S. Navy." As the Navy's agent, C-E enjoys derivative sovereign immunity that bars this suit. Second, C-E did not "make" or "initiate" any phone call as required by the plain language of the TCPA. Third, C-E cannot be held liable because the text message was sent "on behalf of" the Navy. Fourth, under common law agency principles, C-E cannot be held liable in the Navy's stead. Fifth, the TCPA's cell phone provision is overbroad on its face and unconstitutional to the extent that it is being used to prohibit speech constitutionally protected under the First Amendment. Any one of these five reasons compels dismissal of this case. Simply put, C-E cannot be held liable under the TCPA for text messages sent by someone other than C-E on behalf of the Navy. C-E respectfully requests that the Court grant this motion and enter judgment in its favor.

## FACTUAL BACKGROUND

### A.   C-E Contracts With the U.S. Navy to Achieve Recruitment Goals

C-E is a global advertising agency that provides marketing services to clients throughout the United States, including the United States Navy. Declaration of Daniel Rioux ("Rioux Decl.") ¶ 1. C-E is the Navy's advertising agent of record.

1   Declaration of Lee Buchschacher ("Buchschacher Decl.") ¶ 3.  Beginning in 2000,

2   C-E contracted with the Navy to assist it in achieving its recruitment goals.  *Id.*

3   ¶¶ 3-4; Rioux Decl. ¶ 3.

4       "Attracting and recruiting the highest quality people is the most important

5   mission of the United States Navy."  Declaration of Christine M. Reilly ("Reilly

6   Decl.") Ex. 1; Buchschacher Decl. ¶ 2.  Recruitment is essential to the Navy's

7   continued viability in this country's military defense system, and marketing the

8   Navy's message plays a major role.[1]  Buchschacher Decl. ¶¶ 2-3.  The Navy must

9   meet annual and quarterly recruitment goals each year and C-E has been

10  instrumental in helping the Navy achieve or surpass these goals.  *Id.* ¶¶ 2-3, Ex. 1;

11  Rioux Decl. ¶ 3.  Since June 2011, C-E has helped the Navy achieve general

12  enlistment recruitment goals for a record 126 consecutive months.  Rioux Decl. ¶ 3.

13      Navy Recruiting Command ("NRC") is the recruiting arm of the Navy that is

14  devoted solely to Naval recruitment efforts.  Buchschacher Decl. ¶ 2.  In September

15  2005, NRC and C-E executed a fee-based contract for advertising and media to

16  support the Navy's recruitment efforts in 2006.  Rioux Decl. ¶ 4, Ex. 1.  The

17  contract provided various media outlets "consisting of, but not limited to, television,

18  radio, internet, etc. to increase Navy's share of voice, promote Navy brand

19  awareness, and support recruiting efforts."  *Id.* Ex. 1 at 3.  On January 4, 2006, the

20  contract was amended to provide additional services and a larger budget pursuant to

21  a revised media plan approved by NRC.  *Id.* ¶ 5 Exs. 2-4.  A small component of

22  this revised plan consisted of "wireless/mobile marketing."  *Id.* Ex. 4.

23

24  _____

25  [1] *See also* Reilly Decl. Ex. 2 ("The talent we seek doesn't just come walking in the
    door.  We have to go hunting for it.  The marketing and advertising campaign is a

26  really big piece of that search for talent."); *id.* Ex. 3 ("In order to remain an effective
    Naval Force, now and in the future, we must recruit, develop and retain the best and

27  brightest personnel our nation has to offer."); *id.* Ex. 4 ("From the time of the

28  Revolutionary War, Navy recruiters have been a part of our country's history.").

MEMORANDUM OF POINTS & AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-10-2007-DMG (CWx)

**B.     NRC Approves the Recruiting Plan for the Year**

Each year, pursuant to the Navy's contract, C-E hosts an annual strategic conference for NRC, at which time C-E presents a yearly plan for review, discussion and approval that is based on NRC's recruiting goals for the upcoming year and its stated needs. Buchschacher Decl. ¶ 4. NRC then has approximately 30 days to make modifications to the strategic plan presented. *Id.* The NRC Rear Admiral must approve the recruiting plan for the year. *Id.*

After the yearly plan is approved, the Navy oversees the approved campaigns. Buchschacher Decl. ¶ 5. Each campaign requires Navy oversight and review. *Id.* NRC must approve the campaign as well as the copy or creative that bears the Navy brand. *Id.* In addition, there is daily monitoring of campaigns performed by NRC Program Advertising Managers as well as divisional oversight at NRC. *Id.* The Navy also monitors the results of its campaigns through regular communication with C-E. *Id.* The Navy is involved in other aspects as well, such as the preparation and approval of the media itself. *Id.*

**C.     NRC Approves Mobile Campaigns for its Recruiting Audience**

Given its young target audience, it is important to the Navy's recruiting goals to engage in exploratory or emerging media and to be at the forefront of new and innovative media forms, including media made possible through technological advancements. Buchschacher Decl. ¶ 7; Rioux Decl. ¶ 6. NRC shared this vision and objective with C-E and authorized funds for the purpose of exploring new media opportunities, including text messaging, which was an emerging form for media in or about 2005. Buchschacher Decl. ¶ 7, Ex. 2 at 15; Rioux Decl. ¶ 6.

In December 2005, C-E presented NRC with a communications plan providing recommendations for media programs. Buchschacher Decl. ¶ 6, Ex. 2. Among the various media was "Exploratory Media," which included an option for "Wireless/Mobile Marketing" to "Expand on Navy's Direct Response efforts via SMS [text messaging] and WAP [wireless application protocol]." *Id.* Ex. 2 at 15.

MEMORANDUM OF POINTS & AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-10-2007-DMG (CWx)

1 | Fleet Industrial Supply Center (FISC), the Navy's contracting administrator, and
2 | NRC approved the wireless/mobile marketing option for 2006. *Id.* Ex. 2 at 2.

3 | **D.    MindMatics Proposes a Mobile Campaign for the Navy**

4 | Pursuant to the 2006 contract, in February 2006, C-E issued a request for
5 | proposal for "executing wireless advertising from April-June, 2006 on behalf of [its]
6 | client, the United States Navy." Rioux Decl. ¶ 7, Ex. 5. The goal of the "[Navy's]
7 | wireless strategy for 2006 [was] to generate leads" and to recruit "nearly 38,000"
8 | sailors. *Id.* One of the options requested, the "Navy's current wireless best-
9 | practice," was a "Click-to-Call" campaign, which would "allow[] prospects to
10 | connect directly with [the Navy's] call center where required lead information is
11 | gathered and fed daily into the Navy's leads data base." *Id.*

12 | In response to C-E's request for proposals, MindMatics LLC submitted
13 | proposals in February 2006 and April 2006. Rioux Decl. ¶ 8, Exs. 6-7. MindMatics
14 | promoted itself as "the industry's leading full-service provider of mobile marketing
15 | and technology solutions with more than five years experience and over 3,000
16 | mobile marketing campaigns conducted worldwide." *Id.* Ex. 6 at 3 & Ex. 7 at 3. It
17 | recommended a "direct mobile marketing push program" for the Navy "to deliver to
18 | a mobile phone a marketing message via SMS text messaging." *Id.* MindMatics
19 | stated that "[e]ach [text] message will have an embedded phone number, which the
20 | recipient can easily use to call the Navy's call center" and "[e]very message
21 | delivered will be branded with the U.S. Navy's name." *Id.*

22 | This proposed mobile marketing program for the Navy would "deliver[]
23 | direct mobile marketing messages [] directly to consumers' phones, utilizing
24 | MindMatics' managed mobile list." *Id.* ¶ 9 Ex. 6 at 3 & Ex. 7 at 3. MindMatics
25 | assured that its "list ha[d] over 12 million qualified, pre-opted-in mobile users (more
26 | than 3 million U.S.) who have requested that marketing offers be sent to them." *Id.*
27 | MindMatics also represented that it "strictly adhere[d] to [Mobile Marketing
28 | Association] standards to protect our clients and ensure the highest response rates."

1   *Id.* MindMatics' proposal provided that it would "develop and manage each mobile

2   marketing campaign," provide its "carrier-grade infrastructure to facilitate the

3   mobile marketing campaign," "schedule the messages for delivery," and would be

4   "responsible for all necessary gateways, short-codes, and connectivity to deploy the

5   programs[.]" *Id.* Ex. 6 at 7 & Ex. 7 at 4.

6          **E.      The Navy Approves MindMatics' Mobile Campaign**

7          On or about March 17, 2006, C-E presented a powerpoint presentation to

8   NRC entitled "Navy 2006 Wireless/Mobile Tactical Media Recommendations,"

9   which outlined "Exploratory Media" options consistent with the Navy's goals,

10  including MindMatics' text messaging proposal. Rioux Decl. ¶ 10, Ex. 8;

11  Buchschacher Decl. ¶ 8, Ex. 3. The Navy was informed that "MindMatics will

12  deliver a Navy branded SMS (text) direct mobile marketing 'push' program to the

13  cell phones of 150,000 Adults 18-24 from an opt-in list of over 3 million."

14  Buchschacher Decl. ¶ 9, Ex. 3 at 14; Rioux Decl. ¶ 11, Ex. 8 at 14. Because it was

15  the Navy's message and branded with the Navy's name, C-E was required to "gain

16  [NRC] approval to proceed" and to "gain final Navy approvals on creative

17  executions." Buchschacher Decl. ¶ 9, Ex. 3 at 19; Rioux Decl. ¶ 11, Ex. 8 at 19.

18         C-E obtained approvals from the Navy for both the media buy (i.e, the

19  campaign strategy) and the copy. Buchschacher Decl. ¶¶ 11-12; Rioux Decl. ¶ 12.

20  The Navy authorized MindMatics' proposed text message campaign and revised

21  the copy before approving the text message. Buchschacher Decl. ¶ 12, Exs. 4-5;

22  Rioux Decl. ¶ 12, Ex. 9. The Navy approved the following message to potential

23  Naval recruits:

24              Destined for something big? Do it in the Navy. Get a career.

25              An education. And a chance to serve a greater cause. For a

26              FREE Navy video call 1-800-510-2074.

27  Buchschacher Decl. ¶ 12, Ex. 5; Rioux Decl. ¶ 12, Ex. 9.

28

MEMORANDUM OF POINTS & AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-10-2007-DMG (CWx)

1 The message contained a "click-to-call" telephone number for potential

2 recruits to call the Navy's call center and receive the free Navy video.

3 Buchschacher Decl. ¶ 10. The Navy participated in the shooting of the video

4 referenced in the text message. *Id.* ¶ 10.

5 **F. MindMatics Implements the Navy's Mobile Campaign**

6 Between May 10 and May 24, 2006, text messages were sent by MindMatics

7 to potential Naval recruits between the ages of 18 and 24, the Navy's target

8 recruiting audience. Rioux Decl. *¶* 13; Buchschacher Decl. ¶ 10. NRC worked

9 closely with C-E on this campaign and provided Navy oversight and approval.

10 Buchschacher Decl. ¶¶ 11-12. The May 2006 recruiting campaign was a short and

11 minor campaign part of a much larger strategic plan for the Navy in 2006. *Id.* ¶ 11.

12 C-E did not send the text messages. Rioux Decl. ¶ 13. It did not dial the

13 numbers or operate or maintain control over any automated dialing equipment that

14 placed the calls. *Id.* It did not have the capability or technology to do so. *Id.*

15 MindMatics handled the deployment, transmission and delivery of the text

16 messages, including the use of its own SMS short code. *Id.* ¶ 13, Ex. 10;

17 Buchschacher Decl. ¶ 13; *see also* Compl. ¶¶ 9, 16-17.

18 C-E never saw or took possession of the mobile numbers used for the

19 Navy's recruiting campaign. Rioux Decl. ¶ 13. MindMatics alone had possession

20 of the list of "over 12 million qualified, pre-opted-in mobile users" that was used to

21 make the calls. *Id.* Ex. 6 at 3 & Ex. 7 at 3. Gomez alleges that he received a text

22 message from shortcode 43704 on May 10, 2006. Reilly Decl. Ex. 5 [Gomez

23 Depo. Tr. 35:10-21 & Ex. 1 thereto]; *see also* Compl. ¶¶ 15-16. The text message

24 was sent "on behalf of" the United States Navy and was sent solely in the Navy's

25 interests and for its benefit. Rioux Decl. ¶ 14; Buchschacher Decl. ¶ 14; *see also*

26 Compl. ¶ 14.

27

28

# LEGAL ARGUMENT

## I.  Summary Judgment Is Appropriate When, as Here, the Undisputed Facts Compel Dismissal as a Matter of Law

The summary judgment procedure is an integral part of the Federal Rules, designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A party moving for summary judgment bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. *See Taylor v. List*, 880 F.2d 1040, 1044 (9th Cir. 1989). "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

If the moving party meets its burden, the burden then shifts to the opposing party to establish the existence of a genuine issue of material fact as to an essential element of its claim. *Id.* at 322; Fed. R. Civ. P. 56(e). Not every factual dispute will defeat summary judgment; the requirement is that "there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue of material fact is "genuine" only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248

A party opposing summary judgment must not only introduce evidence that creates a genuine issue of material fact, but must also produce sufficient evidence on which the jury could reasonably find for that party. *Id.* at 252. "Where a question presented is purely legal, summary judgment is appropriate without deference to the

1    nonmoving party." *White v. Witt*, No. C05-0695JLR, 2006 WL 2372296, at *1

2    (W.D. Wash. Aug. 15, 2006).

3         There is no genuine dispute regarding the material facts of this case. There is

4    no dispute that Gomez received a text message on behalf of the U.S. Navy asking

5    men and women to "serve a greater cause." There is likewise no dispute that C-E

6    did not send the text message. And there is likewise no dispute that to the extent

7    C-E played any role in the text message campaign, it acted "on behalf of" the U.S.

8    Navy. This case thus presents pure questions of law suitable for resolution on

9    summary judgment. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 352 F.

10    Supp. 2d 1119, 1123 (C.D. Cal. 2005) ("Determination of a motion for summary

11    judgment is appropriate when the parties raise only questions of law, the resolution

12    of which does not involve disputed material facts.")

13 **II.**    **The Doctrine of Derivative Sovereign Immunity Bars This Suit**

14      **A.**    **The Navy Enjoys Absolute Immunity from TCPA Liability**

15         "As a general matter, the federal courts may not entertain an action against the

16    federal government without its consent." *Koohi v. United States*, 976 F.2d 1328,

17    1332 (9th Cir. 1992) (finding action against defense contractors preempted by

18    federal law). "The basic rule of federal sovereign immunity is that the United States

19    cannot be sued at all without the consent of Congress." *Block v. North Dakota*, 461

20    U.S. 273, 287 (1983). "Absent a waiver, sovereign immunity shields the Federal

21    Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

22    Because "[s]overeign immunity is jurisdictional in nature," *id.*, Congress' "waiver

23    of [immunity] must be unequivocally expressed in statutory text and will not be

24    implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996). As such, no court has

25    jurisdiction to award relief against the United States unless the requested relief is

26    expressly and unequivocally authorized by federal statute. *See United States v.*

27    *King*, 395 U.S. 1, 4 (1969).

28

MEMORANDUM OF POINTS & AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-10-2007-DMG (CWx)

1    In passing the TCPA, Congress gave no indication—express or implied—that

2  the government could be held liable under the statute.  Indeed, the statute applies

3  only to "person[s] in the United States," 47 U.S.C. § 227(b)(1), and government

4  entities are not "person[s]."  *See* 47 U.S.C. § 153(39) (defining "person" as "an

5  individual, partnership, association, joint-stock company, trust, or corporation");

6  *Accounting Outsourcing, LLC. v. Verizon Wireless Personal Comm's*, L.P., 329 F.

7  Supp. 2d 789, 806 (M.D. La. 2004) (applying 47 U.S.C. § 153(39) to definition of

8  "person" under TCPA).  *See also* 1 U.S.C. § 1 ("In determining the meaning of any

9  Act of Congress, unless the context indicates otherwise. . . the words 'person' and

10  'whoever' include corporations, companies, associations, firms, partnerships,

11  societies, and joint stock companies, as well as individuals"); *Reynolds v. Diamond*

12  *Foods & Poultry, Inc.*, No. ED 79488, 2002 WL 171438, at *1 n.2 (Mo. App. Feb.

13  5, 2002) (citing 1 U.S.C. § 1 in defining "person" under TCPA).  Because Congress

14  did not expressly authorize TCPA liability against the government, there is no

15  waiver of sovereign immunity permitting suits under the statute.  And because

16  Congress enjoys absolute immunity under the TCPA, so too does its agent C-E.

17    **B.    As the Navy's Agent, C-E Enjoys Derivative Sovereign Immunity**

18    "If absolute immunity protects a particular governmental function, no matter

19  how many times or to what level that function is delegated, it is a small step to

20  protect that function when delegated to private contractors, particularly in light of

21  the government's unquestioned need to delegate governmental functions.  The

22  government cannot perform all necessary and proper services itself and must

23  therefore contract out some services for performance by the private sector[.]"

24  *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1446-48 (4th Cir. 1996).

25    It is "well-settled law that contractors and common law agents acting within

26  the scope of their employment for the United States have derivative sovereign

27  immunity."  *Butters v. Vance Int'l., Inc.*, 225 F.3d 462, 466 (4th Cir. 2000).  When

28  operating "merely as an arm or agent of the ... government in carrying out [an]

1   assigned role," contractors are "entitled to the same immunity from any liability
2   arising from that governmental function as would inure to the government, itself."
3   *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1379 (5th Cir. 1980).
4        The derivative sovereign immunity doctrine traces back to the Supreme
5   Court's decision in *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21-22 (1940).
6   In *Yearsley*, the Supreme Court held that sovereign immunity derivatively extended
7   to a private contractor who, pursuant to a contract with the U.S. Government,
8   constructed dikes that caused the erosion of the plaintiff's land.  The Court held that
9   because the contractor had not exceeded his authority under his valid contract with
10  the United States, his acts amounted to "the act[s] of the government."  *Id.* at 21-22.
11       Although Gomez did not file suit against the Navy, this case "obviously
12  implicate[s] the same interest in getting the Government's work done."  *Boyle v.*
13  *United Techs. Corp.*, 487 U.S. 500, 505 (1988) (holding that a government
14  contractor providing helicopters for the military was not liable under state tort law
15  for injury caused by a design defect).  Where, as here, "authority to carry out the
16  project was validly conferred ... there is no liability on the part of the contractor for
17  executing [the Government's] will."  *Yearsley*, 309 U.S. 18, 20-21.  Here, there can
18  be no dispute that C-E acted at the Navy's direction for recruitment purposes.  *See*
19  Rioux Decl. ¶¶ 3, 5-6, 11-12, 14; Buchschacher Decl. ¶¶ 4-9, 11-12, 14; Compl.
20  ¶ 14 ("[C-E] directed the mass transmission of wireless spam...to advertise on
21  behalf of the U.S. Navy."); *id.* ¶ 1 ("[d]uring one [] campaign for the U.S. Navy").
22  **III.   C-E Cannot Be Held Liable Because It Did Not "Make" or "Initiate" the**
23  **Text Message Sent to Gomez**
24       The TCPA provides that "[i]t shall be unlawful for any person within the
25  United States...to *make* any call (other than a call made for emergency purposes or
26  made with the prior express consent of the called party) using any automatic
27  telephone dialing system or an artificial or prerecorded voice...to any ....cellular
28  telephone service[.]"  47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).  *See also*

MEMORANDUM OF POINTS & AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-10-2007-DMG (CWx)

1  47 C.F.R. § 64.1200(a)(1)(iii) ("No person or entity may...*[i]nitiate* any telephone

2  call...") (emphasis added).

3         Neither the TCPA nor its regulations define the phrases "make any call" or

4  "initiate any telephone call." When Congress does not define terms in a statute,

5  "[t]he court must . . . construe them according to their ordinary and natural

6  meanings." *United States v. Herrera*, 29 F. Supp. 2d 756, 760 (N.D. Tex. 1998);

7  *Romine v. Diversified Collection Servs. Inc.*, 155 F.3d 1142, 1145 (9th Cir. 1998)

8  ("In the absence of [a] statutory definition, a statutory term will be accorded its

9  ordinary meaning."); *Retuta v. Holder*, 591 F.3d 1181, 1188 (9th Cir. 2010) (noting

10 that courts interpret statutes according to their plain meaning).

11        In *Herrera*, the court examined a federal statute that did not define the term

12 "initiate." The court found that "'initiate' commonly means to 'commence; start;

13 [or] introduce.'" *Herrera*, 29 F. Supp. 2d at 760 (alteration in original) (quoting

14 Black's Law Dictionary at 784 (6th ed. 1990)). Thus, under the TCPA, the person

15 or entity that "initiates" a call "commence[s]; start[s]; [or] introduce[s]" the call. *Id.*

16 *See also Satterfield*, 569 F.3d at 953-54 ("To make any call" under the TCPA

17 means "to communicate with or try to get into communication with a person by

18 telephone.") (quoting Webster's Third New International Dictionary 318 (2002)).

19 In short, a person "makes" or "initiates" a call if that person or entity dials the

20 number, or, as in the case of text messaging, sends the text message.[2] *Id.* The

21

22 [2] The TCPA regulations also do not define the terms "make" or "initiate." However,

23 regulations applicable to other provisions of the TCPA define additional terms that
   indicate, consistent with the plain meaning of the term, that the entity that "initiates"

24 the call is the entity that actually dials the number. Specifically, the regulations
   implementing the TCPA define a "seller" as "the person or entity on whose behalf a

25 telephone call or message is initiated." 47 C.F.R. § 64.1200(f)(5). The regulations

26 in turn define a "telemarketer" as "the person or entity that initiates a telephone call
   or message." *Id.* at § 64.1200(f)(6). Thus, a clear distinction exists between the

27 active conduct of a telemarketer (one who "initiates" a call) and the passive conduct

28 of a seller "on whose behalf" a call is made.

1  FCC—the agency charged with implementing and enforcing the TCPA—agrees.

2  Req. for Jud. Notice Ex. 1 (initiating a call is to "directly place the call").

3  　　　Gomez admits that C-E did not "directly place the call." He concedes that

4  "[C-E]'s agent," MindMatics, sent the text message. *See* Compl. ¶ 9 ("[C-E's] agent

5  [] transmitted the text message calls[.]"); *id.* ¶ 16 (Gomez received a text message

6  from SMS short code 43704 "licensed and operated by [C-E's] agent."). These

7  admissions demonstrate that there is no triable issue of fact that C-E did not send

8  Gomez the text message. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224,

9  226 (9th Cir. 1988) ("Judicial admissions are formal admissions in the pleadings

10 which have the effect of withdrawing a fact from issue and dispensing wholly with

11 the need for proof of the fact."); *Hall v. United States*, 314 F. Supp. 1135, 1137-38

12 (N.D. Cal. 1970) ("It is [a] basic rule that statements made in a Complaint may be

13 admitted against the pleader as evidence in the form of judicial admissions.").

14 　　　Gomez's allegations are also confirmed by the undisputed evidence. The text

15 message Gomez received was sent by MindMatics. Rioux Decl. ¶¶ 8, 9, 13, Ex. 6 at

16 7 ("MindMatics delivers direct mobile marketing messages for clients directly to

17 consumers' phones, utilizing MindMatics' managed mobile list."). C-E did not send

18 the text messages. *Id.* ¶ 13. It did not dial the numbers or operate or maintain

19 control over any automated dialing equipment that placed the calls. *Id.* C-E did not

20 have the technology or capability to do so. *Id.* Nor did it provide or have access to

21 the mobile numbers used to make the calls. *Id.*

22 　　　In summary, both Gomez's judicial admissions and the undisputed evidence

23 show that C-E did not "make" or "initiate" the text message to Gomez, and

24 therefore it cannot be held liable under the TCPA. *See Applestein v. Fairfield

25 Resorts*, No. 0004, 2009 WL 5604429, at *5 (Md. Ct. App. July 8, 2009) (noting

26 defendant did not "initiate" offending calls made by independent contractor who

27 was "the registered subscriber of the telephone number included in the calls");

28 Restatement (Third) Of Agency § 7.01 (2006), cmt. c. (liability cannot be imposed

1  on agent acting at principal's direction where imposition of liability is inconsistent

2  with the constitution, statute, regulation, or ordinance).

3  **IV.  C-E Cannot Be Held Liable Because The Text Message Was Sent "on**

4       **Behalf of" the United States Navy**

5       Though the plain language of the TCPA provides liability against entities that

6  "make" or "initiate" a call, some courts have held—pursuant to the provisions of the

7  TCPA applicable to residential telephone calls[3]—that liability under the TCPA may

8  exist for the entity on whose behalf the call is made. *See, e.g., United States v. Dish*

9  *Network, LLC*, 667 F. Supp. 2d 952, 962-63 (C.D. Ill. 2009) ("The FCC Rule uses

10 the phrases 'on whose behalf' and 'on behalf of' to impose responsibility on the

11 person 'on whose behalf' a telephone solicitation is made.") (citing 47 C.F.R.

12 § 64.1200(c)(2)); *In The Matter of Rules and Regulations Implementing the*

13 *Telephone Consumer Protection Act of 1991*, 10 F.C.C.R. 12391, 1995 WL 464817,

14 ¶¶ 12-13 (F.C.C. Aug. 7, 1995) ("Our rules generally establish that the party on

15 whose behalf a solicitation is made bears ultimate responsibility for any violations.

16 Calls placed by an agent of the telemarketer are treated as if the telemarketer itself

17 placed the call.").[4]

18

19
_____

20 [3] *See* 47 C.F.R. §§ 64.1200(a)(2)(v); (c)(2); (d) (prohibiting telephone solicitations
   to residential telephones and holding responsible those who make the call and those

21 on whose behalf the calls are made). *See also* 47 U.S.C. § 227(c)(5).

22 [4] C-E does not concede that such courts are correct. As this Court previously noted,
   the "on behalf of" language is not in the TCPA's statutory provisions or regulations

23 addressing cell phone calls. *See* Mot. to Dismiss Order, Dkt. No. 21 at 8-9. *Cf.*

24 47 U.S.C. § 227(b)(1)(A)(iii), (b)(3) & 47 C.F.R. § 1200(a)(1)(iii) *with* 47 U.S.C.
   § 227(c)(5) & 47 C.F.R. § 1200(c)(2), (d). "[W]here Congress includes particular

25 language in one section of a statute but omits it in another section of the same Act,

26 it is generally presumed that Congress acts intentionally and purposefully in the
   disparate inclusion or exclusion." *INS. v. Cardozo-Fonseca*, 480 U.S. 421, 432

27 (1987); *see also Int'l Science & Tech. Inst., Inc. v. Inacom Commc'ns, Inc.*, 106

28 F.3d 1146, 1152 (4th Cir. 1997) (Congress wrote "precisely" in drafting the TCPA).

MEMORANDUM OF POINTS & AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-10-2007-DMG (CWx)

1    However, "for an entity to be liable for calls it did not place, the calls must

2  have been placed 'on behalf' of the entity." Req. for Jud. Notice Ex. 1 at 10. "On

3  behalf of" is not defined in the TCPA or its regulations. Therefore, courts must

4  "give those terms their ordinary meanings." *Mac's Shell Serv. v. Shell Oil Prods. Co.*

5  *LLC*, 130 S. Ct. 1251, 1257 (2010); *Romine*, 155 F.3d at 1145. "The plain meaning

6  of the phrases 'on whose behalf' or 'on behalf of' is an act by a representative of, or

7  an act for the benefit of, another." *Dish Network*, 667 F. Supp. 2d at 963.

8    Even if "on behalf of" could be implicitly read into Section 227(b)(1)(A)(iii)

9  contrary to well established principles of statutory interpretation, C-E still cannot

10  be held liable under the TCPA. The recruiting text message sent to Gomez was

11  indisputably sent *on behalf of* the Navy, in its interests, and solely for its benefit.

12  Gomez's judicial admissions made this clear from the outset. *See* Compl. ¶ 14

13  ("[C-E] directed the mass transmission of wireless spam to the cell phones of

14  consumers nationwide to advertise *on behalf of* the U.S. Navy.") (emphasis added);

15  *id.* ¶ 1 (noting that the text message campaign was "for the U.S. Navy"). The

16  evidence supports these allegations. *See* Rioux Decl. ¶ 14; Buchschacher Decl.

17  ¶ 14. The text was a message from the Navy asking young men and women to

18  "serve a greater cause" for this country by "do[ing] it in the Navy." Rioux Decl.

19  ¶ 12, Ex. 9. It was neither sent on C-E's behalf nor for its benefit. Simply put, it

20  was the Navy's message. Therefore, liability cannot lie against C-E since the text

21  message was sent on behalf of the U.S. Navy.

22  **V.    C-E Cannot be Held Liable Under Common Law Agency Principles**

23  **Because It Acted as an Agent for the U.S. Navy**

24    C-E also cannot be held liable under general agency principles, since it was

25  acting as an agent on behalf of its principal, the U.S. Navy. "An agent's

26  responsibilities to a principal [include] advice and assistance given by the agent to

27  the principal to protect the principal's interests." Restatement (Third) Of Agency

28

MEMORANDUM OF POINTS & AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-10-2007-DMG (CWx)

1   § 7.01 (2006), cmt. e.[5] Though an agent is generally responsible for its own tortious

2   conduct, an agent cannot be held liable where it acts pursuant to a privilege held by

3   the principal, acts with the principal's interests in mind and for its benefit, and/or the

4   principal authorizes the conduct. *See* Restatement (Second) of Agency § 343 (1958)

5   ("An agent who does an act otherwise a tort is not relieved from liability by the fact

6   that he acted at the command of the principal or on account of the principal, except

7   where he is exercising a privilege of the principal, or a privilege held by him for the

8   protection of the principal's interest, or where the principal owes no duty or less

9   than the normal duty of care to the person harmed."); *id.* at § 345 ("An agent is

10  privileged to do what otherwise would constitute a tort if his principal is privileged

11  to have an agent do it and has authorized the agent to do it."); *id.* § 345, cmt. a

12  ("One who is not privileged to act on his own behalf can exercise a privilege held by

13  others if acting on their account and within the limits of their privilege."); *see also*

14  Restatement (Third) Of Agency § 7.01 (2006), cmt. e.

15       "The word 'privilege'…denote[s] the fact that conduct which, under ordinary

16  circumstances, would subject the actor to liability, under particular circumstances

17  does not subject him to such liability." Restatement (Second) of Torts § 10(1)

18  (1965).[6] "To be protected by a privilege held by the principal, an agent must act for

19  _____

20  [5] Federal statutes are presumed not to incorporate or rely upon state law absent a
    clear congressional statement to the contrary. *See Jerome v. United States*, 318 U.S.

21  101, 104 (1943) (reaffirming "general[] assum[ption]" that, "in the absence of a
    plain indication to the contrary, . . . Congress when it enacts a statute is not making

22  the application of the federal act dependent on state law."). "Federal courts in the

23  Ninth Circuit have adopted the Restatement of Agency as the basis for federal
    common law." *Marshall v. Gravitt*, No. 206-CV-0536-RCJ-GWF, 2007 WL

24  1792416, at *4 (D. Nev. June 18, 2007).

25  [6] A TCPA violation sounds in tort. *See Weber v. U.S. Sterling Secs., Inc.*, 282 Conn.

26  722, 728 (2007) ("Claims under the [TCPA] sound in tort regardless of whether they
    are construed as property or invasion of privacy tort claims."); *US Fax Law Center,*

27  *Inc. v. iHire, Inc.*, 362 F. Supp. 2d 1248, 1252 (D. Colo. 2005) (claims under TCPA

28  sound in tort).

1   the purpose for which the privilege is given to the principal." Restatement (Third)

2   Of Agency § 7.01 (2006), cmt. e. A privilege may be "necessary for the protection

3   of some interest of the actor or of the public which is of such importance as to

4   justify the harm caused or threatened by its exercise" or because "the actor is

5   performing a function for the proper performance of which freedom of action is

6   essential."[7] Restatement (Second) of Torts § 10(2)(b), (c) (1965). "[W]here the

7   privilege is given to persons performing certain public functions in order that they

8   may exercise their functions without fear that in doing so their private interests may

9   be affected, it is necessary that nothing done in the performance of their duty can

10  subject them either to liability or to annoyance or expense incident to even

11  unsuccessful litigation." Restatement (Second) of Torts § 10 (1965), cmt. d.

12      Based on these common law agency principles, C-E cannot be held liable on

13  several grounds. First, the undisputed facts demonstrate that any advice or

14  assistance C-E rendered in connection with the Navy's text message campaign was

15  done so to advance the Navy's interests, on its account, and for its benefit. Rioux

16  Decl. ¶ 14; Buchschacher Decl. ¶ 14. Second, the purpose of the text message

17  campaign was to further the Navy's recruitment interests. *Id.* Third, the Navy

18  authorized, approved, and ratified the text message campaign. Rioux Decl. ¶¶ 3, 5-

19  6, 11-12, 14; Buchschacher Decl. ¶¶ 4-9, 11-12, 14. Fourth, the purpose of the

20

21  _____

    [7] "A privilege may be based on another's consent." Restatement (Third) Of Agency
22  § 7.01 (2006), cmt. e.; *see also* Restatement (Second) of Torts § 10 (1965), cmt. b
    ("Acts which, if not permitted, would be tortious in character and, therefore, subject
23  the actor to liability may be done without risk of liability if the person affected by
    them gives an effective consent to the acts."). Should Gomez survive summary
24  judgment, the issue of consent will pose insurmountable hurdles to Gomez on class
25  certification. Not only are TCPA class actions typically not certified due to the
    predominance of individual issues on consent, but here the text messages were
26  targeted primarily to males between the ages of 18 to 24 who were required by law
27  to sign up for the Selective Service. Applicable law provides that Selective Service
28  registrants consent to being contacted by the military for recruitment purposes.

1   campaign—to recruit young men and women to join the Navy—was necessary to

2   the protection of the Navy's interests and its continued viability and "is of such

3   importance as to justify the harm caused or threatened by its exercise." Restatement

4   (Second) of Torts § 10(2)(b) (1965).  *See* Rioux Decl. ¶ 14; Buchschacher Decl. ¶¶

5   2-3, 14; *supra* at 2 & n. 1. Lastly, this important public interest demonstrates that

6   C-E was "performing a function [] the proper performance of which freedom of

7   action is essential." *Id.* § 10(2)(c).  Given the essential public function that lies at

8   the heart of this lawsuit, "it is necessary that nothing done in the performance of

9   [C-E's or the Navy's] duty can subject them [] to liability." Restatement (Second)

10   of Torts § 10 (1965), cmt. d.

11        For these reasons, imposing liability on C-E would violate basic agency

12   principles.[8]  *See Heine v. Raus*, 399 F.2d 785, 790, 791 (4th Cir. 1968) (summary

13   judgment should be granted in favor of government agent for CIA entitled to same

14   privilege as government if agent acted upon the authority or the subsequent

15   ratification of the CIA); *Welch v. Bancorp Mgmt. Advisors, Inc.*, 296 Ore. 208, 218

16   (1983) (finding summary judgment properly granted for financial adviser where

17   there was no evidence adviser acted outside the scope of authority in advising

18   principal and where there was no genuine issue of material fact that advice was

19   given with the intent of benefiting the principal).

20   **VI.   The TCPA's Cell Phone Provision is Unconstitutional As Applied to the**

21         **Noncommercial Speech in This Case**

22        Courts have consistently affirmed the constitutionality of the TCPA as

23   applied to commercial speech. *See, e.g., Missouri ex rel. Nixon v. American Blast*

24

25   [8] California and Illinois cases are consistent with federal common law. *See Newman v. Checkrite California*, 912 F. Supp. 1354, 1370 (E.D. Cal. 1995) ("California

26   agency law parallels the Restatement of Agency," therefore "no conflict exists" with

27   federal common law.); *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000) ("Illinois law of agency, as well as the federal common law of agency,

28   accord with the Restatement[.]").

1  *Fax, Inc.*, 323 F.3d 649, 660 (8th Cir. 2003) (facsimiles); *Lozano v. Twentieth*

2  *Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1011 (N.D. Ill. 2010) (text

3  messages). They have done so, however, with the understanding that "the TCPA

4  has the potential to chill only pure commercial speech, not speech entitled to full

5  constitutional protection." *Accounting Outsourcing*, 329 F. Supp. 2d at 811. *See id.*

6  at 812 ("[T]he economic motivations that inspire advertising neutralize the fear that

7  protected speech will be chilled."). *See also Abbas v. Selling Source, LLC*, No. 09

8  CV 3413, 2009 WL 4884471, at *7 (N.D. Ill. Dec. 14, 2009) ("Congress, for its part,

9  found that cheap, pervasive telemarketing practices needed to be controlled, ... and

10  intended to restrict unsolicited, automated advertisements and solicitations by

11  telephonic means.").

12      A military recruiting message is not commercial speech—a "military

13  recruiters' speech is clearly Government speech." *Rumsfeld v. Forum for Academic*

14  *and Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006).  Under the First Amendment,

15  government speech is not equivalent to private speech. "The Free Speech Clause

16  restricts government regulation of private speech; it does not regulate government

17  speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 460 (2009).  A

18  government entity has the right to "speak for itself." *Bd. of Regents of Univ. of Wis.*

19  *Sys. v. Southworth*, 529 U.S. 217, 229 (2000).  "[I]t is entitled to say what it wishes,"

20  *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and

21  to select the views that it wants to express. *See Rust v. Sullivan*, 500 U.S. 173, 194

22  (1991).  Because the text at issue constitutes pure government speech—a military

23  recruiting message—it is not subject to First Amendment constraints.

24      However, to the extent that Gomez seeks to hold <u>C-E</u> liable for the Navy's

25  recruiting message, C-E's First Amendment rights are implicated. "[T]he First

26  Amendment imposes tight constraints upon government efforts to restrict, e.g.,

27  'core' political speech, while imposing looser constraints when the government

28  seeks to restrict, e.g., commercial speech, the speech of its own employees, or the

1  regulation-related speech of a firm subject to a traditional regulatory program."

2  *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653, 2673-74 (2011) (Breyer, J., dissenting).

3  "[T]he First Amendment offers considerably less protection to the maintenance of a

4  free marketplace *for goods and services*." *Id.* at 2674 (emphasis added).

5  "'[C]ommercial speech [enjoys] a limited measure of protection, commensurate

6  with its subordinate position in the scale of First Amendment values,' and is subject

7  to 'modes of regulation that might be impermissible in the realm of noncommercial

8  expression.'" *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477

9  (1989) (quotation omitted).

10       Content-neutral time, place and manner restrictions survive First Amendment

11  scrutiny only if they (1) serve a substantial government interest, (2) are narrowly

12  tailored to advance that interest, and (3) leave open ample alternative channels of

13  communication to allow other ways to convey the message. *See Ward v. Rock*

14  *Against Racism*, 491 U.S. 781, 791 (1989). As applied to government speech, the

15  TCPA is not narrowly tailored to advance a substantial government interest.

16  Section 227(b)(1)(A)(iii) of the TCPA serves as a complete bar to automated

17  telephone calls regardless of content. Unlike other sections of the TCPA that merely

18  prohibit certain advertising, Section 227(b)(1)(A)(iii) is not so limited. Restricting

19  the military's wartime recruiting efforts does not further key Congressional

20  objectives of the TCPA. Nor does military recruitment serve a commercial purpose.

21       In enacting the TCPA, Congress intended to restrain commercial

22  telemarketing activities to promote goods and services. *See In The Matter of Rules*

23  *and Regulations Implementing the Telephone Consumer Protection Act of 1991*,

24  7 F.C.C.R. 8752, 1992 WL 690928, ¶ 40 (F.C.C. Oct. 19, 1992) ("[T]he TCPA

25  seeks primarily to protect subscribers from unrestricted commercial telemarketing

26  activities."). No such commercial activities are implicated by the pure government

27  speech at issue here. Gomez concedes as much. Reilly Decl. Ex. 5 [Gomez Depo.

28  Tr. 80:4-10] ("Q: Now, when you received the Navy text message did you think that

MEMORANDUM OF POINTS & AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-10-2007-DMG (CWx)

1  somebody was trying to sell you something?  A: Try to sell me something?

2  Q: Yeah.  A: No.  What I thought is they were trying to make me join the Army or

3  Navy.");  [Gomez Depo. Tr. 36:4-6].  "When Congress enacted the TCPA, it had

4  found that consumers consider noncommercial telephone calls less intrusive because

5  they are more expected." *Accounting Outsourcing*, 329 F. Supp. 2d at 816.

6        Congress also sought to "protect the privacy interests of telephone

7  subscribers" in enacting the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d

8  946, 954 (9th Cir. 2009).  But even "privacy concerns [must] give way when

9  balanced against the interest in publishing matters of public importance." *Bartnicki*

10  *v. Vopper*, 532 U.S. 514, 534 (2001).  Military recruiting is certainly a matter of

11  public importance.  As former Secretary of Defense William Cohen observed in

12  addressing the armed forces:

13              On countless occasions I've been asked by foreign leaders,

14              "How can our military be more like America's?"  I'll

15              repeat here today what I've said time and time again.  It's

16              not our training, although our training is the most rigorous

17              in the world.  It's not our technology, although ours is the

18              most advanced in the world.  And it's not our tactics,

19              although ours is [sic] the most revolutionary in the world.

20              *We have the finest military on Earth because we have the*

21              *finest people on Earth, because we recruit and we retain*

22              *the best that America has to offer.*

23  Reilly Decl. Ex. 6 (emphasis added). *See also* Buchschacher Decl. ¶¶ 2-3, Ex. 1.

24  So significant is the government's obligation and power to "provide and maintain

25  a Navy" that it is expressly written into our Constitution.  U.S. Const., Art. 1, § 8.

26  Any privacy interests furthered by the TCPA's cell phone provisions must "give

27  way" to the military's strong interest in recruiting. *Bartnicki*, 532 U.S. at 534.

28

1     If the TCPA can be applied to government speech or core political speech,

2 then the TCPA is not narrowly tailored to the goals of restraining commercial

3 advertising and protecting privacy.  On its face, Section 227(b)(1)(A)(iii) bars the

4 use of an automated dialing system by a politician to contact constituents; by a

5 citizen to solicit support for a ballot initiative; or even by law enforcement except in

6 emergencies.  As such, "the statute's very existence may cause others not before the

7 court to refrain from constitutionally protected speech or expression."  *City Council*

8 *v. Taxpayers for Vincent*, 466 U.S. 789, 79 (1984).

9         [When] a law punishes a 'substantial' amount of protected

10         free speech, 'judged in relation to the statute's plainly

11         legitimate sweep,'... [it] suffices to invalidate *all* enforcement

12         of that law, 'until and unless a limiting construction or partial

13         invalidation so narrows it as to remove the seeming threat or

14         deterrence to constitutionally protected expression,'...Many

15         persons, rather than undertake the considerable burden (and

16         sometimes risk) of vindicating their rights through case-by-

17         case litigation, will choose simply to abstain from protected

18         speech, ...harming not only themselves but society as a

19         whole, which is deprived of an uninhibited marketplace of

20         ideas.  Overbreadth adjudication, by suspending *all*

21         enforcement of an overinclusive law, reduces [] social costs

22         caused by the withholding of protected speech.

23 *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (citations omitted) (emphasis in

24 original).

25     If Section 227(b)(1)(A)(iii) is interpreted to reach government speech or core

26 political speech, then it is an unconstitutional restraint on speech.  A statute that

27 precludes the government from military recruiting through text messaging is not

28 narrowly tailored to serve substantial government interests.

MEMORANDUM OF POINTS & AUTHORITIES IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT
CASE NO. CV-10-2007-DMG (CWx)

**CONCLUSION**

Based on the undisputed evidence – and Gomez's *own* admissions – that the text message he received was sent by a third-party and on behalf of the United States Navy, C-E cannot as a matter of law be held liable for the TCPA violation alleged in this suit.  Accordingly, judgment should be entered in C-E's favor.

Dated:  October 18, 2011

LOEB & LOEB LLP
MICHAEL M. MALLOW
LAURA A. WYTSMA
CHRISTINE M. REILLY

By _____/s/ Christine M. Reilly_____
Christine M. Reilly
Attorneys for
Campbell-Ewald Company

22

**Vicki Garza**

| | |
|---|---|
| **From:** | cacd_ecfmail@cacd.uscourts.gov |
| **Sent:** | Tuesday, October 18, 2011 5:40 PM |
| **To:** | ecfnef@cacd.uscourts.gov |
| **Subject:** | Activity in Case 2:10-cv-02007-DMG -CW Jose Gomez v. Campbell-Ewald Company Memorandum in Support of Motion |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

## Notice of Electronic Filing

The following transaction was entered by Reilly, Christine on 10/18/2011 at 5:40 PM PDT and filed on 10/18/2011

| | |
|---|---|
| **Case Name:** | Jose Gomez v. Campbell-Ewald Company |
| **Case Number:** | 2:10-cv-02007-DMG -CW |
| **Filer:** | Campbell-Ewald Company |
| **Document Number:** 116 | |

**Docket Text:**
**MEMORANDUM in Support of MOTION for Summary Judgment[115] filed by Defendant Campbell-Ewald Company. (Reilly, Christine)**


**2:10-cv-02007-DMG -CW Notice has been electronically mailed to:**

Christine M Reilly    creilly@loeb.com, ojohnson@loeb.com

Evan M Meyers    emeyers@edelson.com

Laura A Wytsma    lwytsma@loeb.com, vmanssourian@loeb.com

Michael J McMorrow    mjmcmorrow@edelson.com, docket@edelson.com, mike@mjmcmorrow.com

Michael L Mallow    mmallow@loeb.com, dishikawa@loeb.com, dmars@loeb.com, fmckeown@loeb.com, mshortnacy@loeb.com, rrappaport@loeb.com, vgarza@loeb.com

Rafey S Balabanian    rbalabanian@edelson.com

Ryan D Andrews    randrews@edelson.com

1

Sean Patrick Reis    sreis@edelson.com, sreis@reisfirm.com

Steven W Teppler    steppler@edelson.com, steppler@timecertain.com

**2:10-cv-02007-DMG -CW Notice has been delivered by First Class U. S. Mail or by other means to: :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\Memo of Points and Authorities.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=10/18/2011] [FileNumber=12470495-
0] [33107375e4fb6d9f66c5c375b7539d8b3f128b20fcb6b3feab235b3604ac8de3d7
5906264df21835e44404291d8278ce313e989fc52c88b0264aafd645ca47c0]]

2

1
## PROOF OF SERVICE

2    I, Martha Ortiz, the undersigned, declare that:

3    I am employed in the County of Los Angeles, State of California, over the age

4    of 18, and not a party to this cause.  My business address is 10100 Santa Monica

5    Boulevard, Suite 2200, Los Angeles, California 90067-4120.

6    On March 13, 2012, I served a true copy of the **NOTICE OF**

7    **CONSTITUTIONAL QUESTION RE: THE TELEPHONE CONSUMER**

8    **PROTECTION ACT AS APPLIED TO NON-COMMERCIAL SPEECH ON**

9    **BEHALF OF THE UNITED STATES NAVY** on the parties in this cause as

10   follows:

11   **[X]    (VIA FEDERAL EXPRESS)** by placing the above named document

12   in a sealed envelope addressed as set forth below, or on the attached service list and

13   by then placing said envelope for collection and overnight delivery via Federal

14   Express in accordance with Loeb & Loeb's ordinary business practices; and

15   **[X]    (VIA CERTIFIED MAIL)** by placing the above named document in a

16   sealed envelope addressed as set forth below, or on the attached service list. I caused

17   each such envelope, with postage thereon fully prepaid. to be deposited for

18   collection and mailing with the United States Postal Service in accordance with

19   Loeb & Loeb's ordinary business practices.

20   **U.S. Department of Justice**
     **Attn:  Eric H. Holder, Jr.**
21   **Attorney General of the United States**
     **950 Pennsylvania Avenue, NW**
22   **Washington, DC 20530-0001**

23   I am readily familiar with Loeb & Loeb LLP's practice for collecting and

24   processing correspondence for mailing with the United States Postal Service and

25   Overnight Delivery Service. That practice includes the deposit of all correspondence

26   with the United States Postal Service and/or Overnight Delivery Service the same

27   day it is collected and processed.

28   I certify that I am employed in the office of a member of the bar of this court

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2207498.2
202999-10981

3

NOTICE OF CONSTITUTIONAL QUESTION RE: THE
TELEPHONE CONSUMER PROTECTION ACT

1    at whose direction the service was made.

2       I declare under penalty of perjury under the laws of the State of California

3    that the foregoing is true and correct.

4       Executed on March 13, 2012, at Los Angeles, California.

5

6                  Martha Ortiz

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

LA2207498.2
202999-10981

4

NOTICE OF CONSTITUTIONAL QUESTION RE: THE
TELEPHONE CONSUMER PROTECTION ACT